**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

Citizens Communications Co.,          :
                                      :
                    Plaintiff,        :        NO.    3:01cv948 (MRK)
                                      :
v.                                    :
                                      :
Trustmark Insurance, et al.,          :
                                      :
                    Defendants.       :


<u>MEMORANDUM  OF  DECISION</u>

Citizens Communications ("Plaintiff" or "Citizens") brings this action against Defendants

Trustmark Insurance ("Trustmark"), RMTS Associates ("RMTS"), and American Stop Loss

Insurance Brokerage Services ("ASL"), seeking declaratory relief and damages stemming from a

dispute over Defendants' alleged breach of contractual insurance coverage obligations. All of the

parties have filed motions for summary judgment [docs. #63, 65, 70, 73]. For the reasons stated

below, Plaintiff's Motion for Summary Judgment [doc. #73] is DENIED; Trustmark's Motion for

Summary Judgment [doc. #63] is GRANTED in part and DENIED in part; RMTS's Motion for

Summary Judgment [doc. #65] is GRANTED in part and DENIED in part; and ASL's Motion for

Summary Judgment [doc. #70] is GRANTED in part and DENIED in part.


**I.**

The dispute arises from a contract between Citizens and Trustmark for Trustmark to

supply medical stop-loss insurance to Citizens. Stop-loss insurance is purchased primarily by

1

large corporations that self-insure their employees. The insurance reimburses the corporation for claims paid under its self-funded plan, usually pursuant to a high deductible. The primary purpose of stop-loss insurance is to avoid the risk of a single catastrophic claim. Citizens, as the seventh largest telephone company in the United States, with assets of nearly $7 billion (for the year ending Dec. 31, 2000), and with about 5000 employees, provides health insurance to its employees under such a self-funded health plan (the "Plan"). Citizens' Mem. of Law in Supp. Of Summ. J. [doc. #75], at 3; Trustmark's Local Rule 9(c)(1) Statement [doc. #67] ¶1. This case involves disputes between Citizens and its stop-loss insurance provider, Trustmark, for reimbursement of medical expenses incurred by three individuals (Patrick Leggett, Thomas Grimme, and Garry Lonquist) who were beneficiaries of the Citizens Plan.

In July 1998, Citizens, through the third-party administrator of the Plan – North American Benefits Network ("NABN") – hired Defendant ASL to serve as Citizens' broker for acquiring medical stop-loss insurance. Amend. Compl. [doc. #53] ¶16. ASL was to obtain rate quotations for stop-loss insurance with a $100,000 deductible that would reimburse Citizens for hospital and medical claims paid pursuant to the Plan. *Id.* In October 1998, ASL requested a rate quotation from RMTS, a company that markets the insurance products of other companies. *Id.* ¶19, 20.

**The 1999 Policy.**    RMTS provided ASL with a rate quotation from Trustmark for the specific stop-loss insurance policy ASL had requested.  *Id.* ¶ 22. Trustmark is an insurance company that issues stop-loss insurance coverage as well as other insurance products. Trustmark's Local Rule 9(c)(1) Statement [doc. #67] ¶4. In its rate quotation, dated October 15, 1998, RMTS presented Trustmark's offer to ASL, stating that the proposed coverage was contingent on RMTS (and Trustmark) receiving certain information from Citizens about the

2

persons to be covered by the policy. *Id.* ¶¶15-19. Specifically, Trustmark requested identification of Citizens "[e]mployees and/or dependents currently disabled, under long-term treatment or on COBRA." *Id.* ¶18. Additionally, Trustmark requested information about "[c]laims (including names) which have exceeded $50,000 in the past twelve months and those expected to exceed $50,000 in the next twelve months with diagnosis and prognosis." J.A. [doc. #68] Ex.6 (emphasis in original). RMTS stated in bold-face type on the October 15, 1998 quotation that this information was "required in order for [it] to evaluate the risk and complete the application," and stated that any proposed coverage was "contingent upon RMTS receiving the [ ] information" requested. *Id.* Apparently, ASL never asked Citizens to provide any of this information. Trustmark's Local Rule 9(c)(1) Statement [doc. #67] ¶23; Citizens' Local Rule 9(c)(2) Statement [doc. #89] ¶23.

However, ASL did request (through NABN) certain information from Citizens in a November 25, 1998 letter, in which ASL stated that it required, among other documents, a "[c]ompleted and signed disclosure statement." J.A. [doc. #68] Ex. 8. NABN requested the information from Citizens in a letter dated December 15, 1998, asking that Citizens complete the Supplementary Contract Data Sheet for General Information and advising Citizens that the Data Sheet would act as a Disclosure Notice. *Id.* Ex. 9. The Disclosure Notice included eight questions designed to identify claims already in process as well as other potentially large claims involving individuals covered under the Citizens Plan. Question #7 of the Disclosure Notice asked whether "any employee or dependent now enrolling for coverage had any medical condition(s) for which expenses have exceeded $10,000 in the past twelve months or which might be expected to exceed $10,000 in the next twelve months?" *Id.* Ex. 9 at 1832.

3

Marianne Seyler was at the time the Citizens benefits specialist responsible for providing information to insurance vendors. It is undisputed that in response to Question #7, Ms. Seyler did not disclose any employees or dependents for which medical expenses might be expected to exceed $10,000 in 1999, although Ms. Seyler testified at her deposition that she understood that to be what Trustmark was asking for in Question # 7. *Id.* Ex. 11; Citizens' Local Rule 9(c)(2) Statement [doc. #89], ¶26, 27. Ms. Seyler did provide information about Citizens employees and dependents who had incurred claims in excess of $75,000 in 1998. J.A., Ex. 11. JoAnn Farrall, Citizens' Director of Corporate Benefits and a Vice President of the company, signed the Disclosure Notice and mailed it to ASL on December 29, 1998, which forwarded it along to RMTS. *Id.* Neither Ms. Farrall nor Ms. Seyler advised Trustmark or RMTS that they were unable to obtain information fully responsive to Question #7. Dep. Of Marianne Seyler, J.A. [doc. #69] Ex. 61, at 275-76.

Trustmark issued a medical stop loss insurance policy to Citizens, effective January 1, 1999, providing for an individual deductible of $100,000 with a 15/12 basis, which means that when the expenses for a covered individual exceeded $100,000 in claims paid by Citizens during 1999 for services rendered either in 1999 or the last three months of 1998, the claim would be eligible for reimbursement under the Trustmark policy. J.A. [doc. #68] Ex. 7. The quoted monthly rate for the Trustmark policy was determined based upon information provided by Citizens and its agents during the underwriting process. *Id.*

Patrick Leggett, an insulin-dependent diabetic spouse of a Citizens employee, was placed on a waiting list for a pancreatic transplant at some time in 1996 or 1997, and the procedure was pre-certified by Citizens at that time to be covered by the Citizens Plan. Citizens' Local Rule

4

9(c)(2) Statement, ¶43. Mr. Leggett was not disclosed by Citizens on the Disclosure Form in response to the question about expected claims over $10,000 in 1999, *Id.* ¶48, although Citizens acknowledges that at least Ms. Farrall of Citizens knew about Mr. Leggett's medical situation at the time Citizens submitted the Disclosure Form. *Id.* ¶47. Mr. Leggett underwent a pancreatic transplant on April 4, 1999, *Id.* ¶44, and incurred $139,536.34 in medical expenses for treatments relating to the transplant between April 1 and April 14, 1999. *Id.* ¶45.

On behalf of Citizens, NABN submitted to Trustmark on October 8, 1999 a request for reimbursement for $115,121.48 for Mr. Leggett's medical bills. *Id.* ¶49. RMTS requested additional information from NABN regarding the Leggett claim on November 12, December 1, December 14, 1999, and January 13, 2000. *Id.* ¶50. In February 2000, NABN, again on behalf of Citizens, submitted to Trustmark another request for reimbursement for Mr. Leggett's medical bills, in the amount of $46,369.58. *Id.* ¶51. On April 7, 2000, RMTS, on behalf of Trustmark, informed ASL that it had concerns about whether Mr. Leggett's medical situation should have been disclosed during the underwriting process and that it planned to audit the claim for Mr. Leggett's expenses to determine whether disclosure was required. *Id.* ¶52, 53. In a letter dated December 15, 2000, and sent by RMTS to NABN on December 20, 2000, Trustmark denied reimbursement for the Leggett claim on the ground that Mr. Leggett should have been disclosed during the underwriting process. *Id.* ¶54.

Thomas Grimme was a Citizens employee in 1999 and was a beneficiary of the Citizens Plan. Citizens' Local Rule 9(c)(1) Statement [doc. #74], ¶12. Mr. Grimme had been on long-term disability since June 1, 1998, suffering from a "chordoma," a malignant brain tumor that typically recurs. Trustmark's Mem. In Opp. To Pl.'s Mot. For Partial Summ. J. [doc. #85] at 6. Citizens did

5

not disclose Mr. Grimme as an employee whose medical expenses were likely to exceed $10,000 in 1999. On February 28, 2000, ASL requested reimbursement for Mr. Grimme's 1999 medical expenses paid by the Plan. After an audit, Trustmark denied the claim on December 15, 2000, both because the claim had not been disclosed in the underwriting process and because Trustmark maintains that Mr. Grimme was not covered by the stop loss insurance contract. J.A. [doc. #68], Ex. 50, at 748-49.[1]

On October 21, 1999, the doctor for Garry Lonquist, a Citizens employee, requested pre-certification of aortic valve replacement surgery and mitral valve replacement surgery. Mr. Lonquist underwent cardiac catherization on October 29, 1999, which confirmed the need for the valve replacement surgery. Gateway, Citizens' case management provider, pre-certified Mr. Lonquist's surgery, along with five days of hospitalization, and he was admitted to the hospital on November 29, 1999. Trustmark's Mem. of Law [doc. #64] at 15-16. The surgery took place on November 30, 1999. On December 8, 1999, Gateway learned that Mr. Lonquist had been experiencing complications and remained unstable for discharge. *Id.* at 16. Gateway further learned on December 9 that Mr. Lonquist had undergone sternal wound debridement and on

---

[1]There is a dispute between the parties (which this Court does not resolve on these motions) about whether Mr. Grimme was a "covered person" under the Trustmark insurance policy. Citizens points to the definition of "Covered Person" in the Stop Loss Insurance Contract, which "means an employee of the Contract Holder or a dependent of such employee who is eligible for benefits under the Plan." Farrall Decl. ¶22, Ex. D. [doc. #77], at 4. Trustmark asserts that Citizens amended its Plan in October 1999 to "grandfather" employees on Long-Term Disability such as Mr. Grimme into the Plan, and did not forward the "grandfathering" amendment to Trustmark or otherwise inform Trustmark that it had amended the Plan. Trustmark's Mem. In Opp. To Pl.'s Mot. For Partial Summ. J. [doc. #85] at 6; Ex. E, §24.5. Accordingly, pursuant to Part IV of the Insurance Contract, which governs "Change of Plan Exposure," Trustmark argues that it was not bound by the Amendment. Farrall Decl. ¶22, Ex. D. [doc. #77], at 6. Citizens responds that Mr. Grimme was eligible for benefits under the Plan at the time Citizens applied for the 1999 policy. Citizens' Reply Brief [doc. #92] at 10.

6

December 13 learned that Mr. Lonquist was in intensive care on a ventilator and recovering from

a staph infection. *Id.* By this point, NABN had scanned into its computer system bills totaling

approximately $222,000 for Mr. Lonquist's medical care. Citizens' Local Rule 9(c)(2) Statement

[doc. #89], ¶63. At this point, Gateway requested authorization of "case management" from

Citizens, which is a "red flag" that the claim will be an increased amount of money. *Id.* ¶64, 65.

Case management was authorized on December 15, 1999. *Id.* ¶66.

    **The 2000 Renewal.**    Meanwhile, in September 1999, ASL had notified RMTS that

Citizens intended to renew the Trustmark stop-loss insurance policy for 2000. Trustmark's Mem.

of Law [doc. #64] at 15. In a letter dated September 22, 1999, RMTS informed ASL that the

2000 renewal would be capped at an increase of no more than 5% over the 1999 Trustmark

policy, and that RMTS required confirmation that "as of November 30, [1999,] RMTS has

received notification on all <u>known</u> claimants with the potential to exceed the $100,000 Specific

deductible for the 1999 contract period and any existing claims with the potential to exceed the

Specific deductible for the 2000 contract period based on diagnosis and paid/pending claims."

J.A. [doc. #68], Ex.14 (emphasis in original). On December 7, 1999, RMTS sent ASL a follow-

up letter, reiterating that the "renewal is based on the assumption that there are no other claims,

except the claims and potential claims [already identified], which will exceed the $100,000

Specific deductible for the 1/1/99 to 12/31/99 contract period and that there are no currently

developing claims with the potential to exceed the $100,000 Specific deductible for the 1/1/99 to

12/31/99 contract year based upon diagnosis and/or pending claims. Should updated claim data

prove this assumption to be wrong, we reserve the right to amend the Specific rate and/or set

higher individual deductibles retroactive to the effective date of the renewal contract period." *Id.*

Ex. 19.[2]

The Trustmark renewal proposal was accepted by John Rowland for ASL on behalf of

Citizens, without identification of any currently developing claims with potential to exceed

$100,000, although the parties disagree about the date on which ASL accepted the Trustmark

proposal. Citizens claims the proposal was accepted on December 10, 1999 (the date on which

Mr. Rowland signed his acceptance); Trustmark counters that the renewal proposal was not

accepted until January 11, 2000 (the date on which ASL's acceptance was faxed to RMTS). *Id.*

The Court need not resolve that dispute to dispose of the pending motions.

On January 12, 2000, the day after ASL faxed RMTS the acceptance of the 2000 renewal

policy, Citizens faxed Trustmark an initial notice of Mr. Lonquist's stop-loss claim in the amount

of $1,053,657.44. J.A. [doc. #68], Ex.24. Mr. Lonquist's medical bills ultimately reached $3.1

million. *Id*. Ex.31. Trustmark sent ASL a letter, dated February 15, 2000, indicating that "[t]he

acceptance of the renewal offer 49 days after the precertification request without disclosing this

potential claimant to RMTS is unacceptable. The failure to make this potential loss known to

RMTS is contrary to the terms of the renewal offer." *Id.* Ex. 29. Trustmark then offered Citizens

two options: either Citizens could "accept the rescission of stop loss coverage beginning January

1, 2000," with all premiums returned, or Trustmark would accept the renewal with the existing

terms and conditions except that the rate increase would be 30% over the previous year, and the

policy would include a separate $1 million deductible for Garry Lonquist, effectively removing

---

[2]Trustmark asserts that the references to the "1/1/99 to 12/31/99 contract period" are typographical errors and should have been understood to refer to the 1/1/00 to 12/31/00 contract period as the intent was to determine the premium for the 2000 policy. Mem. of Law [doc. #64] at 17 n.13. Citizens disputes this characterization. Citizens Mem. of Law in Opp'n to Summ. J. [doc. #88], at 33.

him from the Plan's coverage because the Plan contained a $1 million maximum benefit. *Id.*

This proviso regarding Mr. Lonquist is referred to by the parties as the "Lonquist Laser."

Trustmark indicated that if it did not receive a response to its offer within ten days it would

"return the premium and treat the renewal as void." *Id.*

On February 16, 2000, NABN sent a letter to ASL acknowledging that ASL had advised

it that day that Trustmark was denying the Lonquist claim and was considering rescinding the

policy. *Id.* Ex. 30. RMTS responded on February 18, 2000 with additional detail about

Trustmark's offer. In addition to the Lonquist Laser, Trustmark's offer included higher

deductibles for several other high-risk persons. *Id.* Ex. 32. ASL indicated in response to RMTS's

letter that Citizens might accept Trustmark's initial offer of February 15 with the Lonquist Laser,

but Citizens would not accept the renewal with lasers for other individuals. Dep. of David Kalm,

J.A. [doc. #69], Ex. 56 at 250-51. On February 22, 2000, NABN notified Citizens that Trustmark

would not agree to its proposal, but that Trustmark would convey a new proposal to Citizens

soon thereafter. J.A. [doc. #68], Ex. 34. On the afternoon of February 25, NABN faxed to

Citizens the terms Trustmark offered for the 2000 renewal, which were effectively the terms of

the original 2000 renewal plus the Lonquist Laser; Citizens was advised that the offer expired at

close of business that day. *Id.* Ex. 35. Following discussions that afternoon, Ms. Seyler of

Citizens faxed a letter to Trustmark accepting the revised proposal and noting that it had had less

than two hours to make the decision. The letter stated that "[i]n accepting this proposal, the

undersigned company does not waive any or all claims it may have with respect to the excluded

individual." *Id.* Ex. 36.

RMTS responded to Citizens on February 28, stating that Citizens' reservation of rights

had converted its "acceptance" into a counteroffer. RMTS informed Citizens that Trustmark rejected the Citizens counteroffer but would give Citizens until March 1 to respond to the Trustmark offer, a deadline that was later extended to March 3. *Id.* Ex. 40, 41. Apparently in an attempt to explore other options for obtaining stop-loss insurance, on March 2 ASL forwarded to NABN, on behalf of Citizens, rate quotes for stop-loss insurance from two other insurance providers – Reliastar and American National.  Each quote excluded Mr. Lonquist from coverage and had an annual premium that was approximately $100,000 more expensive than Trustmark's renewal offer. *Id.* Ex. 43.

On March 3, Citizens accepted Trustmark's offer and confirmed its acceptance in a letter dated March 6 from Ms. Farrall, an officer of Citizens (the "March 6 Agreement").  In her cover letter Ms. Farrall recited the terms of Trustmark's offer, which included the fact that "Trustmark will set a separate deductible for Mr. Lonquist of $1,000,000.  In effect, Trustmark will remove Mr. Lonquist's claims as eligible for Specific Stop Loss coverage." *Id.* Ex. 44, 45. Attached to Ms. Farrall's cover letter was a term sheet that also expressly acknowledged agreement to the Lonquist Laser.  *Id.*

Citizens then proceeded to pay premiums in accordance with the March 6 Agreement and to submit claims for reimbursement pursuant to the insurance contract. *See, e.g.,* J.A. [doc. #69], Ex. 51; Dep. of Henry Trevor, Ex. 64, at 83-84. Ultimately, Citizens entered into a settlement with the hospitals that had provided care to Mr. Lonquist, under which Citizens paid $800,000 for invoices that exceeded $3 million. Citizens' Local Rule 9(c)(2) Statement [doc. #89] ¶80. In October 2000, Citizens for the first time informed Trustmark that Citizens did not consider itself bound by the terms of the March 6 Agreement and that in particular, Citizens did not consider

10

itself bound by the Lonquist Laser. Aff. of Henry Trevor, J.A. [doc. #68], Ex.1. ¶8.

The original Complaint was filed in the action on May 25, 2001. Compl. [doc. #1]. The Amended Complaint alleges ten causes of action against the defendants: 1) declaratory judgment against Trustmark and RMTS that Mr. Lonquist was covered by the 2000 renewal policy and that the Lonquist Laser was invalid; 2) breach of contract against Trustmark and RMTS with regard to the 2000 renewal; 3) breach of contract against Trustmark and RMTS with regard to the 1999 policy; 4) estoppel against Trustmark and RMTS with regard to the 1999 policy; 5) breach of the implied covenant of good faith and fair dealing against Trustmark and RMTS with regard to both the 1999 policy and the 2000 renewal; 6) violation of the Connecticut Unfair, Deceptive, and Prohibited Insurance Practices Act (CUIPA), Conn. Gen. Stat. §38a-815, et seq., against Trustmark and RMTS with regard to both the 1999 policy and the 2000 renewal; 7) violation of the Connecticut Unfair, Deceptive, and Prohibited Trade Practices Act (CUTPA), Conn. Gen. Stat. §42-110a, et seq., against Trustmark and RMTS with regard to both the 1999 policy and the 2000 renewal; 8) a claim in the alternative against ASL for negligence with regard to the 1999 policy; 9) a claim in the alternative against ASL for negligence with regard to the 2000 renewal; and 10) a claim in the alternative of negligent misrepresentation against ASL. Amend. Compl. [doc. #53].

All of the parties have moved for partial summary judgment. Citizens seeks summary judgment on the first and third causes of action. Citizens' Mem. of Law [doc. #75], at 1-3. Trustmark seeks summary judgment on the first through seventh causes of action, but only with regard to the Leggett and Lonquist claims. Trustmark's Mem. of Law [doc. #64] at 22. RMTS seeks summary judgment on the first through fifth causes of action with regard to all of the

claims, as well as on the sixth and seventh causes of action with regard to the Leggett and

Lonquist claims. RMTS's Mem. of Law [doc. #66] at 18. ASL seeks summary judgment on the

eighth, ninth, and tenth causes of action. ASL's Mem. in Support of Mot. for Summ. J. [doc. #71]

at 4.


## II.

Summary judgment is appropriate when there is no dispute as to a genuine issue of

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party carries the

burden of demonstrating that there is no genuine material dispute of fact. *Carlton v. Mystic*

*Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). The Court will address each of the claims

individually.

Before discussing the contested motions, there are a number of the summary judgment

motions that are uncontested, and this Court will dispose of them at this time. RMTS's motion

for summary judgment on the first, second, third, and fourth causes of action is unopposed by

Citizens and is, therefore, granted. Citizens' Mem. of Law in Opp'n [doc. #88] at 1. ASL's motion

for summary judgment on the tenth cause of action is granted, absent opposition by Citizens. Pl.'s

Supp. Mem. [doc. #103] at 2, n.3. Based on Trustmark's representation at oral argument that it

will not pursue any claim that the denial of the Lonquist claims was based in any way on ASL's

untimely renewal, ASL's motion for summary judgment on the ninth cause of action is granted

absent objection. Finally, Citizens and ASL agree that the eighth cause of action is tied to the

third cause of action; if Citizens' motion for summary judgment on the third cause of action is

granted, the eighth cause of action will be dismissed, if it is not granted, ASL's motion for summary judgment on the eighth cause of action will be denied. *Id.* at 5.

## A.      The Leggett Claim

Citizens' third and fifth causes of action relate directly to the Leggett claim. Trustmark has moved for summary judgment as to both of these causes of action, while Citizens has moved for summary judgment on the third cause of action alone. Citizens claims that Trustmark and RMTS breached the stop-loss insurance contract and the duty of the implied covenant of good faith and fair dealing by not paying the Leggett claim. Amend. Compl. ¶103-105, 117-125. Trustmark argues that Citizens' failure to disclose Mr. Leggett's condition during the underwriting process constituted a material misrepresentation and thus a material breach of the contract, thereby discharging Trustmark's duties under the contract. Trustmark's Mem. of Law [doc. #64] at 26-30. Citizens' primary response to this defense is that there was no knowing or material misrepresentation. Citizens' Mem. of Law in Opp'n [doc. #88] at 5-6.

It is clear that the question whether Citizens knew or should have known about Mr. Leggett's condition is a question of fact which is properly the province of the jury. *See, e.g., McClintock v. Rivard*, 219 Conn. 417, 427 (Conn. 1991) ("Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact."). The essence of the dispute here is whether Citizens' knowledge of Mr. Leggett's need for a pancreas transplant and placement on a waiting list for a pancreas rose to the level of knowledge that his claim "might be expected to exceed $10,000 in the next twelve months" as requested in the Disclosure Form. J.A. [doc. #68], Ex. 9, at 1832. Citizens points out that Mr. Leggett had been on the pancreas waiting list for two

years without receiving a transplant and that as a consequence there was no reason for Citizens to expect that he would have such a transplant in 1999. Citizens' Mem. of Law in Opp'n [doc. #88] at 12. Trustmark contends that Citizens' knowledge of Mr. Leggett's condition and its knowledge that a pancreatic transplant would cost more than $10,000 required Citizens to disclose to Trustmark that Mr. Leggett's claims might exceed $10,000 for 1999. Trustmark's Reply [doc. #94] at 3. A dispute of this nature, where the parties disagree about what one party knew at a certain point, unquestionably constitutes a material dispute of fact and is exactly what the summary judgment process is designed *not* to resolve. This Court will leave this question to the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Citizens also raises a series of additional defenses suggesting various reasons why the letter from RMTS to ASL seeking identification of Citizens "[e]mployees and/or dependents currently disabled, under long-term treatment or on COBRA," J.A. [doc. #68] Ex. 6, and requesting information about "[c]laims (including names) which have exceeded $50,000 in the past twelve months and those expected to exceed $50,000 in the next twelve months with diagnosis and prognosis," *Id.* (emphasis in original), should not have been relied upon by Trustmark, essentially because ASL never conveyed the letter to Citizens, Citizens' Mem. of Law in Opp'n [doc. #88] at 6-11. In light of the fact that Citizens also failed to divulge the Leggett claim on the Disclosure Notice, the question of knowing and material misrepresentation remains to be determined at trial, and this Court will not now decide the issues that Citizens raises surrounding the RMTS letter.

14

**B.      The Grimme Claim**

Although Trustmark does not move for summary judgment as to the Grimme claim,

Citizens does move for summary judgment on its third cause of action as to the Grimme claim,

arguing that because Mr. Grimme was covered by the policy (which is itself contested, *see supra*

note 1), and because "Trustmark cannot demonstrate that any . . . alleged omission was

*knowingly* made, Trustmark's arguments and affirmative defenses fail as a matter of law."

Citizens' Mem. of Law [doc. #75] at 20. As noted in the discussion of the Leggett claim, the

question whether an omission was knowingly made is inherently a question of fact. As there is a

genuine dispute of material fact as to whether Citizens knowingly omitted the Grimme claim,

summary judgment on this claim is denied.

**C.      The CUIPA/CUTPA Claims**

Trustmark moves for summary judgment on the CUIPA and CUTPA claims as well.

Citizens' Amended Complaint alleges that Trustmark engaged in unfair claim settlement

practices as "a general business practice," involving misrepresentations of the terms of the

insurance policy and refusal to pay legitimate claims, Amend. Compl. ¶127-141, and

"knowingly, purposefully, and misleadingly engaged in reckless and wanton conduct" regarding

the claims. *Id.* ¶145. It is clear that the CUIPA and CUTPA violations stand or fall together. *See*

*Martin v. Am. Equity Ins. Co.*, 185 F. Supp. 2d 162, 168 (D.Conn. 2002) ("Although plaintiff

may bring a private cause of action under CUTPA for an alleged violation of CUIPA, she may

not bring an action under CUTPA unless the alleged unfair insurance practice violates CUIPA.").

It is also clear that, like the other causes of action relating to the Leggett and Grimme claims that

implicate these issues, the questions of misrepresentation and the legitimacy of the claims presents a disputed issue of material fact and is properly the province of the jury. Trustmark's motion for summary judgment on the sixth and seventh causes of action with regard to these claims is denied.

**D.     The Claims Against RMTS**

RMTS moves for summary judgment on all of the causes of action that Citizens has brought against RMTS, on the grounds that it never entered into a contractual relationship with Citizens. Citizens has agreed to dismiss the first, second, third, and fourth causes of action against RMTS, but continues to press the remaining counts. These allege that RMTS breached its implied covenant of good faith and fair dealing and violated CUIPA and CUTPA. RMTS asserts that, as a breach of covenant of good faith and fair dealing must stem from the existence of a contract, *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793 (Conn. 2000) ("[T]he existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing."), and it is clear that RMTS was not a party to any contract with Citizens, Citizens' Local Rule 9(c)(2) Statement [doc. #89], ¶84, 85, RMTS did not owe such a duty to Citizens and thus could not have breached any such duty.

Citizens argues in response that RMTS' undisputed status as Trustmark's agent in these proceedings allows it to be sued for breach of the covenant of good faith and fair dealing. The parties agree that a disclosed agent such as RMTS cannot be sued in contract but can be sued for its tort; *see Scribner v. O'Brien, Inc.*, 169 Conn. 389, 404 (Conn. 1975) ("Where, however, an

16

agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby."); they disagree, however, on whether a cause of action for breach of implied covenant of good faith and fair dealing sounds more in contract than in tort. Connecticut courts have explicitly stated that the breach of the covenant of good faith and fair dealing creates a distinct tort cause of action. The Connecticut Superior Court quotes the California case of *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566 (1973), "[I]n every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is immanent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." The Court concludes: "This court likewise adopts the *Gruenberg* rule." *Grand Sheet Metal Products Co. v. Protection Mut. Ins. Co.*, 34 Conn. Supp. 46, 47-48, 51 (Conn. Sup. Ct. 1977); *see also Buckman v. People Express, Inc.*, 205 Conn. 166, 171 (1987).

It is clear that the interaction between Citizens and RMTS occurred within the context of a contractual relationship, even if RMTS' role in the relationship was not as a party but as the agent of a contracting party. As the agent of a party who had a duty of good faith based on a contract, RMTS also effectively had such a duty in its interactions in the contractual relationship. RMTS seems to recognize this itself: "The issue here is not whether Citizens could bring its suit against RMTS; the issue is whether following discovery in this matter, any genuine issue of material fact exists with regard to RMTS's liability to Citizens for damages purportedly relating to the Leggett or Lonquist claims." RMTS' Reply [doc. #93] at 5-6. This Court finds that Citizens has made allegations to raise a genuine issue of material fact as to whether RMTS breached this

17

duty in its capacity as Trustmark's agent, *See* Amend. Compl. [doc. #53], ¶120-124, and denies the motion for summary judgment.

With regard to the CUIPA and CUTPA claims, RMTS again asserts that Citizens makes no claim of "independent wrongdoing" on its part, RMTS' Reply [doc. #93] at 4, while Citizens maintains that RMTS can be liable on the basis of its actions as Trustmark's agent, and does assert wrongdoing on RMTS' part of this kind. Amend. Compl. [doc. #53], ¶126-147. The CUTPA and CUIPA causes of action are based in part on a practice offending "public policy as it has been established by statutes, the common law, or otherwise -- whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness." *Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747, 756 (Conn. 1984). Here, RMTS can be liable as Trustmark's agent for CUIPA and CUTPA violations since the alleged unfairness and breach of public policy stems from the tort alleged in Plaintiff's claim of breach of implied duty of good faith and fair dealing and the Connecticut Supreme Court, as noted *supra*, has held that agents can be liable for torts they commit on behalf of their principals, *see Scribner*, 169 Conn. at 404. Since a material issue of disputed fact exists as to whether these torts were committed, *see supra* at 17, RMTS' motion for summary judgment as to these causes of action is denied.

**E.     The Lonquist Claim**

Both parties have moved for summary judgment with regard to the causes of action surrounding the Lonquist claim. Citizens seeks a declaratory judgment that Mr. Lonquist was included within the 2000 policy subject to a deductible of $100,000, because Citizens argues that

the Lonquist Laser was invalid. Trustmark seeks dismissal of all the Lonquist causes of action based on both Citizens' alleged misrepresentation, and resulting material breach, as well as on the basis of the Lonquist Laser, which effectively excludes his claims from the policy. At argument the parties agreed that if the Court determines that the Lonquist Laser constituted a valid amendment of the Trustmark policy, the Court need not reach Citizens' causes of action regarding Trustmark's denial of the Lonquist claim nor Trustmark's allegations that Citizen made misrepresentations regarding the Lonquist claim. *See New England Petroleum Corp. v. Groppo*, 214 Conn. 444, 450 (Conn. 1990) ("A written contract can be modified by a subsequent parol agreement if that is the intention of the parties, because the parties to a written contract retain the power to alter or vary or discharge any of its provisions by a subsequent agreement.") (internal quotes omitted).

There seems to be no dispute that the March 6 Agreement between Citizens and Trustmark, in which the parties agreed upon the premium for the policy renewal and also agreed upon the Lonquist Laser, ordinarily would constitute a valid contract. The standard for creating a contract is well settled. "To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. If the minds of the parties have not truly met, no enforceable contract exists. An agreement must be definite and certain as to its terms and requirements." *L & R Realty v. Connecticut Nat'l Bank*, 53 Conn. App. 524, 534-535 (Conn. App. 1999) (internal quotations omitted). Here, there was an offer by Trustmark, an acceptance by Citizens, intent by the parties to form a contract, a meeting of the minds about its terms,

definite terms, and consideration. *See* J.A. [doc. #68], Ex. 45. Under traditional contract

principles, therefore, the March 6 Agreement unquestionably would qualify as a valid

amendment to the existing insurance contract between the parties.

However, Citizens maintains that, whatever the amendment's status under Connecticut

contract law generally, the amendment is not a valid amendment under the terms of the original

insurance contract. That contract states as follows: "All changes in the Contract must be

approved by an officer of the Company and be evidenced by an endorsement on the Contract or

by an amendment to the Contract signed by the Contract Holder." *Id.* Ex. 21 at 10.[3] Citizens

concedes that the March 6 Agreement was approved by an officer of Trustmark and signed by an

officer of Citizens, but Citizens argues that the terms of the March 6 Agreement were never

reflected in an "endorsement" on or "amendment" to the Contract, as required by the policy

language. In support of its argument, Citizens cites to an amendment executed by Trustmark on

May 23, 2000, which is set forth on a form entitled "AMENDMENT" and which specifies that it

is "[a]ttached to and forming part of" the insurance policy. *Id.* Ex. 48. Since the Lonquist Laser

was not set forth on such an AMENDMENT form, Citizens argues that it is not effective under

the terms of the policy.

Trustmark responds that the term "amendment" is not defined in the insurance contract

and therefore an amendment can be accomplished in any manner that is sufficient under state law

---

[3] The policy also specifies that "[t]his Contract contains all the agreements between the Contract Holder and the Company. Its terms may not be changed or waived except by amendment issued by the Company," J.A. Ex. 21 at 6. Though Citizens initially argued that this merger clause barred consideration of the documents constituting the March 6 Agreement, at oral argument Citizens did not pursue this argument and rightly so in the Court's view. Instead, Citizens asserted that the agreement reached by the parties was not effective under the terms of Trustmark's own policy.

to bind parties. Furthermore, in an uncontested affidavit submitted with its summary judgment motion, Trustmark represents that the company "does not customarily include information regarding lasers or increased retention levels of covered persons in an 'amendment page.' Such pages generally reflect only any changes to the premiums charged during a subsequent policy year." Aff. of Henry Trevor, Trustmark's Mem. in Opp'n to Summ. J. [doc. #85], Ex. F. ¶18.

Unlike the other issues discussed above, there is no dispute of facts regarding this issue, and therefore, the Court can rule on the validity of the Lonquist Laser as a matter of law. Both sides agree that an agreement was reached and what that agreement specifies. The sole point of contention is whether the agreement constitutes a valid amendment under the terms of the insurance policy. Based upon the evidence submitted by the parties, the Court concludes that the Lonquist Laser is a valid and effective amendment of the parties' insurance policy. Although the policy defines many of its terms, it does not define the term "amendment"; nor does anything in the policy specify precisely what an amendment must look like, other than that it must be approved by Trustmark and signed by Citizens, both of which occurred here.

"Connecticut courts have consistently referred to dictionary definitions to interpret words used in insurance contracts." *Middlesex Mutual Assurance Co. v. Walsh*, 218 Conn. 681, 695 n. 7 (1991) (internal quotation and citation omitted). The ordinary meaning of the term "amendment" is "a change made by correction, addition, or deletion." *See* Random House Webster's Unabridged Dictionary 66 (2001). That is precisely what occurred here, when the parties knowingly agreed, in return for good and valuable consideration, to alter or change the terms of

the original 2000 renewal by deleting or removing the Lonquist claim from the 2000 policy.[4]

Citing to the May 2000 Amendment, Citizens suggests that the term "amendment" in the policy must be a term of art that requires a particular form. But there is no evidence other than the May 2000 Amendment itself to support Citizens' assertion. Trustmark explained in affidavits that its customary business practice was not to include laser agreements, such as the Lonquist Laser, in formal "amendment" pages such as the May 2000 Amendment. Trustmark's affidavit is unrebutted and uncontradicted by Citizens. It is Citizen's burden, as the party opposing summary judgment and seeking to invalidate an otherwise valid contract, to demonstrate that the Lonquist Laser was ineffective under the policy, or at least that there exists a genuine issue of material fact regarding the effect of the Lonquist Laser. *See, e.g., Anderson*, 477 U.S. at 248 ("A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.") (internal quotations and citations omitted). That is a burden that Citizens has not discharged.

Accordingly, under the plain language of the contract, the Court concludes that any agreement that meets the requirements necessary to form a contract under state law and that is signed and approved by both parties satisfies the requirements of the policy and is a valid and enforceable  amendment. Because the Lonquist Laser set forth in the March 6 Agreement unquestionably meets that standard, it is a valid amendment of the parties' insurance contract.

---

[4]Citizens argues that Connecticut courts generally construe contracts against the insurer in cases of ambiguity. Though this may be correct, it is irrelevant here as the March 6 agreement was clearly intended to amend the original contract and thus qualifies as an "amendment" in the absence of any evidence which would indicate that the term "amendment" was in any way ambiguous.

Citizens' final contention is that if the amendment is valid under the terms of the contract, it was procured under circumstances constituting duress and is thus invalid. The standard for claims of duress in Connecticut is clear: "For a party to demonstrate duress, it must prove [1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim." *Noble v. White*, 66 Conn. App. 54, 59 (Conn. App. 2001) (internal quotations omitted). *Noble* also sets out the standard for what constitutes a "wrongful" act: "Where a party insists on a contractual provision or a payment that he honestly believes he is entitled to receive, unless that belief is without any reasonable basis, his conduct is not wrongful and does not constitute duress or coercion under Connecticut law." *Id.*

Thus, to prove duress, Citizens must, as an initial matter, convince a jury that there was no reasonable basis whatsoever for Trustmark to believe that Citizens had made a material misrepresentation regarding the Lonquist claim and therefore was in breach of the contract. Here, Citizens submitted the Lonquist claim – a single claim that represented approximately 150% of the annual cost of the *entire* policy – one day after ASL had communicated Citizens' acceptance of the renewal and acknowledgment that Citizens knew of no claims that might exceed $100,000 in the coming year. On the basis of this undisputed evidence, this Court holds that no reasonable jury could find that Trustmark's position was wrongful as that term is defined under Connecticut law. *See Hellstrom v. U.S. Dept of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("[I]f after discovery, the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," summary judgment is appropriate). While Trustmark's position ultimately might or might not have been

sustained by a court or jury, no reasonable person on the basis of the record presented could conclude that Trustmark's position's was "without any reasonable basis," as Connecticut law requires. *See, e.g., Weiner v. Minor*, 124 Conn. 92, 95 (1938) ("Where one insists on a payment which he honestly believes he is entitled to receive, certainly unless that belief is without any reasonable ground, his conduct is not wrongful and does not constitute duress"); *Noble*, 66 Conn. at 59.

The Court is fortified in this belief by the result of the *Noble* case, in which the Appellate Court of Connecticut reversed a trial court decision finding duress in a case where an attorney allegedly coerced the signing of a new payment agreement on the courthouse steps on the day of a foreclosure hearing by threatening he would not proceed with the representation unless the agreement was signed. *Id.* The Appellate Court found that the discussion on the courthouse steps was not the first time the new payment agreement was presented to the clients and that the contract was actually signed four days before the hearing. *Id.* at 60. The absence of immediacy raised doubts about the duress finding, *id.*, especially, though the Appellate Court does not explicitly say so, the question whether the client actually had no reasonable alternative.

Here too, the Court concludes that no reasonable jury could find that Citizens had no reasonable alternative but to accept the Trustmark proposal in March of 2000. Citizens is a multi-billion dollar company that negotiated for weeks with Trustmark with the assistance of sophisticated counsel. It is undisputed that Citizens had alternatives that it could have pursued rather than accepting Trustmark's offer. For example, Citizens could have sued Trustmark and sought a declaratory judgment regarding the parties' respective rights under the original contract. Moreover, Citizens also could have secured alternative insurance from other providers that

would have minimized its risks while Citizens pursued a lawsuit against Trustmark. The record shows that Citizens explored that option and obtained quotations from at least two other insurance providers. While each of those insurers would have charged more for the policy than Trustmark, the difference between Trustmark's offer and the other quotations is approximately $100,000, an amount that the billion-dollar Citizens readily could have afforded. *See* Restatement Contracts 2d § 175, Comment b ("In the case of a threatened denial of needed goods or services, the availability on the market of similar goods or services may afford a reasonable means of avoiding the threat").

The record shows that Citizens (represented by counsel) actively negotiated with Trustmark over a bona fide dispute regarding the Lonquist claim, and chose to accept Trustmark's proposal over other reasonable alternatives that Citizens had available to it. Citizens must now live with the consequences of its decision.  The Court finds that Citizens has not demonstrated duress, and accordingly, grants summary judgment to Trustmark on all causes of action relating to the Lonquist claim.


**F.     ASL**

As noted above, ASL's motion for summary judgment on the ninth and tenth causes of action is unopposed and is granted. Furthermore, ASL's motion for summary judgment on the eighth cause of action is maintained only to the extent Citizens is granted summary judgment on the third cause of action. Because Citizens' motion for summary judgment on the third cause of action is denied, ASL's motion for summary judgment on the eighth cause of action is denied as well.

Accordingly, Plaintiff's Motion for Summary Judgment [doc. #73] is DENIED; Trustmark's Motion for Summary Judgment [doc. #63] is GRANTED in part and DENIED in part; RMTS's Motion for Summary Judgment [doc. #65] is GRANTED in part and DENIED in part; and ASL's Motion for Summary Judgment [doc. #70] is GRANTED in part and DENIED in part. Following these rulings, the causes of action that remain in this case and therefore must be tried are the following: the third cause of action against Trustmark; the fourth cause of action against Trustmark; the fifth cause of action against both Trustmark and RMTS with regard to the Leggett and Grimme claims only; the sixth and seventh causes of action against both Trustmark and RMTS with regard to the Leggett and Grimme claims only; and the eighth cause of action against ASL.

IT IS SO ORDERED.

/s/_____Mark R. Kravitz_____
                        U.S.D.J.

Dated at New Haven, Connecticut: February 18, 2004